Patricia A. WRIGHT, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civil Action No. 95–0274–LFO.

United States District Court, District of Columbia.

April 16, 1997.

Mark R. Thompson, Foret & Thompson, Washington, DC, for Plaintiffs.

Marina Utgoff Braswell, Assistant U.S. Attorney, Washington, DC, for Defendant.

## MEMORANDUM

OBERDORFER, District Judge.

This case involves a lawsuit for damages under the Federal Tort Claims Act ("FTCA"). Plaintiffs allege that the United States Park Police engaged in an unreasonable search and seizure of their home in northwest Washington, D.C. They originally filed suit against the United States, the District of Columbia, and several individuals, all of whom were affiliated with the U.S. Park Police. *See* Pl.'s Compl. at 2–3. Prior to trial, the allegations against the District of Columbia were dismissed due to plaintiffs' failure to allege any wrongdoing on the part of the District or any District employee. The allegations against the individual defendants were also dismissed based on grounds of qualified immunity. Thus, the only claims that proceeded to trial were those against the United States under the FTCA.

### I.

On September 30, 1996, a nine-day bench trial commenced, in which thirteen witnesses

were called to testify. Through their testimony, as well as the documentary evidence that was introduced, the following facts were developed. Plaintiffs are five members of an extended family living in a row-house at 437 Kenyon Street, N.W. in Washington, D.C. The two principal plaintiffs are a middle-aged couple, Patricia Wright and Tyrone Wright. Patricia Wright has three sons from a prior marriage, one of whom is Justo Cruz. Justo Cruz and his wife, Michelle Cruz, are also plaintiffs in this case. The fifth plaintiff is Tyrone Wright's elderly mother, Fannie Wright.

On March 10, 1992, at approximately 10:00 p.m., twelve officers from the U.S. Park Police forcibly entered and searched the Wrights' home at 437 Kenyon Street pursuant to a search warrant for illegal firearms. In the process, they bartered down the front door, kicked open an upstairs bedroom door, and berated, forcibly restrained, and handcuffed various members of the family. One officer struck Justo Cruz on the head with a pistol barrel. Plaintiffs allege, in general, that the officers conducted their search in a negligent, reckless, and malicious manner, resulting in property damage, physical injuries, and emotional distress.

The primary catalyst for these events was a confidential informant named Daniel Pinkney. Pinkney was an informant for the U.S. Park Police and, on at least five prior occasions, had provided reliable information that led to arrests. His "control officer" was a member of the U.S. Park Police, Officer Michael Smith.[1] On March 10, 1992, sometime in the late afternoon, Pinkney telephoned Officer M. Smith, claiming to have been at 437 Kenyon Street earlier that day and to have seen numerous firearms in the basement of the house, including a silver 9mm pistol and a multi-round, quick-loading shotgun, known as a "street sweeper." Pinkney informed Officer M. Smith, moreover, that illegal narcotics were being sold at 437 Kenyon Street, and that he could buy drugs there.

As it turned out, however, in this particular instance, Pinkney was not a reliable informant. Apparently, unbeknownst to Officer M. Smith. Pinkney and Justo Cruz had formerly been close friends, but had subsequently had a falling out Pinkney now held a personal grudge against Cruz and sought to fabricate a story, so that the U.S. Park Police would be duped into harassing Cruz for his benefit. Pinkney told the truth concerning one fact, however. Cruz did possess a silver 9mm pistol at 437 Kenyon Street. That pistol had been validly purchased by Justo Cruz's brother, David Cruz. On the morning of March 10, 1992, the two of them had gone to a shooting range in eastern Virginia. David Cruz had left the pistol, however, along with its carrying case, at the Wrights' home in the District—where possession of a firearm is illegal.

Officer M. Smith, unaware of the animosity between Pinkney and Cruz, relied on the information provided by Pinkney, and requested that he attempt to engage in a controlled buy of narcotics from 437 Kenyon Street. During the evening of March 10, 1992, at around 7:00 or 8:00 p.m., Officer M. Smith and another member of the U.S. Park Police, Officer Todd Reid, accompanied Pinkney to that address in a white unmarked police van with tinted windows. They parked across the street, and the police officers gave Pinkney a pre-marked sum of money. Pinkney then walked to the front door of 437 Kenyon Street. Patricia Wright and Justo Cruz observed Pinkney as he was walking towards the front porch, but neither of them knew why he was there. Cruz did not wish to talk to Pinkney, however, so he left through the back door, as Patricia Wright admitted Pinkney through the front door. Pinkney entered the house and, without incident, followed Cruz out the back door into an alley behind Kenyon Street. There, he found Cruz standing with a friend, James Evans, also known as "Squeaky." Cruz proceeded to confront Pinkney about something Pinkney had said previously. The conversation quickly became heated, and at some point, Cruz and Squeaky threatened to assault Pinkney.

---

[1]. Officer Michael Smith will be referred to as Officer I. Smith, in order to differentiate him from Officer Patrick Smith, who will be referred to as Officer P. Smith.

According to Cruz, Pinkney ran down one of the alleys towards Kenyon Street, while being chased by himself and Squeaky. Pinkney then jumped into the unmarked police van, which drove away. According to Officers M. Smith and Reid, however, Pinkney was "escorted" by Cruz and Squeaky back to Kenyon Street at gunpoint. Both officers testified that they saw Cruz holding a silver 9mm pistol in his hand, which was pointed at Pinkney's thigh. According to their testimony, Pinkney was led toward the police van and then released.[2]

After the police van drove away and Pinkney was dropped off, Officers M. Smith and Reid informed their superior, Sergeant John Marsh, about what had transpired. Sergeant Marsh then drafted an affidavit in support of a search warrant and obtained the approval of an Assistant United States Attorney. The AUSA, however, allegedly instructed Marsh to omit the information about the failed controlled buy, in order to protect the identity of Pinkney as a confidential informant. Based on the affidavit submitted by Sergeant Marsh, the U.S. Park Police obtained a warrant from Judge Queen, authorizing a search of 437 Kenyon Street for illegal firearms and ammunition.

At about 10:00 p.m., with warrant in hand, the U.S. Park Police assembled a twelve-officer SWAT force at a staging area near the Washington Metropolitan Hospital. Four members of the team were fully fledged Park Police SWAT officers: Sergeant James Moore, Officer Patrick Smith, Officer Brian Casey, and Officer Craig Davis. Each wore black raid gear, consisting of a black helmet, black sweater, and black fatigue pants. They were identified by gold U.S. Park Police badges on their chest and were armed with semi-automatic rifles. There were also five Park Police Narcotic/Vice officers: Sergeant Marsh, Officer John Dowd, Officer Richard Eagan, Officer Reid, and Officer M. Smith. Each of those officers wore street clothes and a vinyl raid jacket, which if but-

toned up, displayed the words "Park Police" on the front and back. Officers Dowd and Eagan were also carrying a battering ram. Lastly, there were three officers from the Rock Creek Park station: Lieutenant Henry Berberich, who was the ranking officer in the group, Sergeant Charles Orton, and Officer Michelle Berkowitz. Those officers wore traditional Park Police uniforms, with blue shirts, blue pants, a badge on the front chest, and a patch on the left shoulder.

At the staging area, the officers were briefed about the search warrant and told that a confidential informant had reported seeing guns in the basement of the house. They were also warned that the search would be "high risk." Thereafter, the police force proceeded to 437 Kenyon Street to execute the search warrant. The officers deployed themselves, and Sergeant Marsh performed the knock-and-announce. He testified that be knocked loudly on the front door twice and announced "Police with a warrant." Meanwhile, inside the house, Justo Cruz was in his basement-bedroom with Michelle Cruz, when he heard what he believed was a noisy commotion on the first floor. He went up to investigate, and fearing that Pinkney had come back with some friends, he brought his brother's 9mm pistol with him, tucked into the waistband near the small of his back.

According to Justo Cruz, he went upstairs to the first-floor foyer, which was unlit. The front door was closed and locked, and the blinds covering the windows were shut. Cruz lifted up one of the slats on the blinds, to peer out. Once he saw the police, he shouted, "I gotta get a key." Apparently, the front door was locked in such a manner that it required a key to open the door from both the outside and the inside. Cruz then stepped away from the front door, towards the right-hand wall, where the key was hanging. At the same time, he took the 9mm pistol from his waistband and placed it on the bookshelf.

---

**2.** On cross-examination, the officers admitted that, at the time of the attempted controlled buy, it was dark and the street lights were on. Moreover, although Officer M. Smith testified that be saw Justo Cruz, Pinkney, and Squeaky standing side-by-side, Officer Reid testified that he saw only Cruz and Pinkney, but not Squeaky. Nonetheless, it is more likely than not that it was Cruz, armed with a pistol, who followed Pinkney from the alley back to Kenyon Street in sight of the unmarked van.

Patricia Wright testified that, when the front door is closed, the blinds are shut, and the foyer light is off, a person standing outside on the porch cannot see inside the house. Sergeant Marsh testified—contrary to Cruz—that the foyer was lit from the inside, and therefore, he could see "something like a gun" in Cruz's hand, at which point he determined the existence of exigent circumstances. Marsh claims that he shouted, "Gun!"—as a warning to the other police officers.[3] Then, he ordered Officers Dowd and Eagan to break open the door with the battering ram. All of the officers had their weapons drawn when Officers Dowd and Eagan rammed open the door. The SWAT team entered first to secure the area. SWAT Officers P. Smith and Davis went to the second floor, and SWAT Sergeant Moore went down to the basement.

At this point, the different versions of what happened diverge substantially. According to Justo Cruz, who was inside the door on the first floor, he immediately placed his hands up in the air and attempted to "assume the position" against the wall near the bookcase. Officer P. Smith, who was trying to reach the stairs quickly to the second floor, shoved Cruz out of the way, pushing him onto the bottom steps of the stairway. Officer P. Smith then proceeded up the stairs. Officer Dowd's assignment was to subdue Cruz as soon as he entered the foyer, so he pushed Cruz off the stairs and threw him down onto the foyer floor. Officer Dowd testified that Cruz attempted to get up off the floor several times. So, during the third attempt, he hit Cruz on the head with the barrel of his gun. The blow left a single laceration on Cruz's scalp. After that, Cruz lay still, and Officer Dowd handcuffed him. Cruz claims that, sometime after he was handcuffed, Dowd struck him a second time with a gun.[4] A few minutes later, Cruz was picked up and brought into the dining room.

On the second floor, Officer P. Smith ran up the stairway, where he claims to have seen Patricia and Tyrone Wright running down the hallway towards their bedroom. Officer P. Smith testified that he ordered the Wrights to "get down," but they continued heedless into their bedroom and closed the door. According to the Wrights, however, Officer P. Smith could not have possibly seen them running down the second-floor hallway because they were in their bedroom during the entire time. In any event, by the time Officer P. Smith reached the door to the Wrights' bedroom, it was closed. Officer P. Smith announced that he was a police officer and then kicked open the door.

Patricia and Tyrone Wright were both standing near the bed. They were shouting, "Why are you here? Get out of here!" After Officer P. Smith entered the room, Officer Reid followed shortly thereafter. Officer P. Smith pushed Tyrone Wright to the floor, and Officer Reid either knelt or stood on top of him. Officer Reid claims that he then holstered his pistol, knelt on top of Tyrone Wright's back with one knee and proceeded to handcuff him. He took one arm and brought it behind Tyrone Wright's back and placed the handcuff on, then switched knees, and took the other arm and locked the handcuffs together. In contrast, Tyrone Wright claims that Officer Reid held a gun to his head while handcuffing him, and then stomped on his back several times and kicked him in the legs once. During this time, Officer P. Smith stood in the doorway with his semi-automatic rifle.

After handcuffing Tyrone Wright, Officer Reid then went to Patricia Wright and told her to "Shut the f—— up." Patricia Wright admits that she was highly agitated. Although Officer Reid tried to force Patricia Wright to sit down on the bed, she continually tried to stand up. At one point, Officer Reid pushed Patricia Wright down on the

---

3. The testimony of several other officers indicated that they did *not* hear Sergeant Marsh shout, "Gun!" Moreover, in his internal affairs interview, Marsh was asked whether he could see specifically what Justo Cruz was placing on the ledge. Marsh responded that he could not, and that it was only afterwards he "was told" there was a gun on the bookshelf.

4. Officer Dowd denies hitting Justo Cruz a second time. Although Cruz asserts that he was struck twice on the head, the photographs of his head appear to indicate only one injury.

bed and held her there. According to Patricia Wright, he also held a gun to her head and said, "I'm gonna blow your mother–f——— brains out." Some time later, Officer Berkowitz, who was the only female officer among the twelve, came upstairs and asked if anyone needed to be searched. Officer Berkowitz conducted a quick pat-down search of Patricia Wright, over her clothes. On several occasions, Patricia Wright asked to see a search warrant, but the officers informed her that she would receive one later.

Finally, in the basement, Sergeant Moore went downstairs and found Michelle Cruz in bed. He ordered her to put her hands up in the air. She told him that she had no clothes on, but Sergeant Moore repeated his order. According to Michelle Cruz, he had a semi-automatic rifle pointed at her forehead, almost touching her. Sergeant Moore claims that he was at least several feet away. Eventually, when Michelle Cruz stood up and put her hands in the air, her bed-sheet fell down, exposing her as unclothed. Michelle Cruz was immediately given a nightshirt to cover herself. Officer Berkowitz then conducted a quick pat-down search of Michelle Cruz, even though it must have been obvious that she possessed no weapons. Thereafter, Michelle Cruz was brought upstairs to the kitchen.

After all of the inhabitants of the house were accounted for, the police officers were given the "All Clear" signal, and they holstered their firearms. Then, they proceeded to conduct a room-by-room search of the house. Lieutenant Berberich informed Patricia and Tyrone Wright that they would receive a copy of the warrant once the search was completed. The police officers searched the house for illegal firearms, opening closets and drawers, and removing some of the Wrights' clothing and personal items. According to Sergeant Marsh, normal police procedure dictates that removed items should be left out, so that they can put back into place by their rightful owners.[5] After searching the house, the police officers recovered a silver 9mm pistol, an ammunition clip, a buck knife, and a machete. The buck knife

and machete were found in the basement, and Justo Cruz testified that they were mementos from his father. Finally, as the police were preparing to leave, Patricia Wright was furnished with a copy of the search warrant.

Based on possession of the silver 9mm pistol, the U.S. Park Police decided to arrest Justo Cruz. Officers P. Smith and Davis first took him in their squad car to the District of Columbia General Hospital, where his head wound was treated. Then, Cruz was taken to the local police station, where he was booked by the desk clerk on duty for possession of an unregistered firearm and possession of unregistered ammunition. Cruz spent the remainder of the night in jail. According to Lieutenant Berberich, however, the desk clerk could have simply issued a citation to Cruz and then released him from custody. The failure to do so was characterized by Lieutenant Berberich as a "screw-up." Eventually, the charges against Cruz were dropped.

## II.

After the close of plaintiffs' case-in-chief, the Government moved for judgment on partial findings. *See* Fed.R.Civ.P. 52(c) (1996). An Order dated October 8, 1996, ruled that, in light of the lack of evidence regarding Fannie Wright, her claims would be dismissed. After the close of summations, the remainder of the case was taken under advisement. The testimony and documentary evidence establish the following findings of fact, which have been proven by a preponderance of the evidence:

1. Based on the information available at the time, Officer M. Smith acted reasonably in relying on the statements of the confidential informant, Daniel Pinkney. Officer M. Smith also acted appropriately in conducting further investigation and requesting Pinkney to attempt a controlled buy of narcotics from 437 Kenyon Street.

2. At the time of the attempted controlled buy, it is more likely than not that Officers

---

**5.** The Wrights testified that, during the search, police officers scattered clothes over the floor, broke jewelry and picture frames, and pawed through some of their intimate belongings.

M. Smith and Reid observed Justo Cruz carrying a 9mm pistol.

3. Sergeant Marsh acted improperly when he omitted the episode regarding the failed controlled buy from his affidavit in support of a search warrant. In doing so, he altered the totality of facts presented to Judge Queen and undermined the constitutional procedure that requires a neutral and detached magistrate to render an informed determination of probable cause. Moreover, Sergeant Marsh's purported concern for protecting the identity of the confidential informant, Daniel Pinkney, could have easily been assuaged by filing his affidavit under seal.

4. Nonetheless, there is insufficient evidence to indicate that Sergeant Marsh acted with deliberate falsehood or reckless indifference to the truth. Sergeant Marsh testified that, in drafting his affidavit in support of a search warrant, he acted under the direction of an Assistant United States Attorney. There is no evidence in the record to the contrary.

5. Even if the episode regarding the failed controlled buy had been included by Sergeant Marsh in his affidavit, it would not have undermined a finding of probable cause by Judge Queen. The search warrant signed by Judge Queen authorized a search for illegal firearms and ammunition. Evidence regarding the failed controlled buy would have undermined only a search warrant authorizing a search for illegal narcotics.

6. Given the information available at the time, especially the concern that multiple high-powered firearms were located at 437 Kenyon Street, it was reasonable for the U.S. Park Police to execute the search warrant as soon as possible on March 10.1992.

7. It is more likely than not that, while performing the knock-and-announce, Sergeant Marsh observed Justo Cruz carrying a gun or "something like a gun." That observation, in addition to the fact that Justo Cruz appeared to be moving away from the door and possibly toward the staircase, made it reasonable for Sergeant Marsh to determine that exigent circumstances existed, requiring the immediate breach of the front door.

8. Given the information available at the time, it was reasonable for the police officers to have their firearms at the read, while entering 437 Kenyon Street and while attempting to apprehend the residents.[6]

9. On the first-floor foyer, given the undisputed facts that Justo Cruz attempted to get up several times after being ordered to stay down and that a 9mm pistol was within his reach on the bookcase, it was reasonable for Officer Dowd to strike Cruz on the back of the head with the barrel of his pistol.

10. It is more likely than not that there only a single laceration on Cruz's scalp and that Officer Dowd did *not* strike Justo Cruz a second time.

11. It is undisputed that Officer Dowd used profanity in attempting to subdue Cruz; however, given the circumstances, which involved a tense and potentially dangerous situation, such use of profanity was not unreasonable.

12. On the second floor, regardless of whether Officer P. Smith actually saw Patricia and Tyrone Wright running towards the main bedroom, it was reasonable for him, given the information available at the time, to kick open the bedroom door.

13. Given the physical difficulty that would be involved in simultaneously holding a gun to someone's head and also handcuffing that person behind the back, it is more likely than not that Officer Reid holstered his firearm before handcuffing Tyrone Wright. Thus, Officer Reid did not improperly threaten deadly force against him.

14. It is more likely that not that Officer Reid did not stomp or kick Tyrone Wright while handcuffing him; however, it is also more likely than not that Officer Reid used profanity.

---

6. As the Supreme Court has instructed, "the calculus of unreasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

15. Given the undisputed fact that Patricia Wright was extremely agitated and was not complying with the orders of Officers P. Smith and Reid, it was reasonable for Officer Reid to push Patricia Wright onto the bed. It is also more likely than not that Officer Reid used reasonable force in doing so.

16. It is more likely than not, however, that Officer Reid used profanity against Patricia Wright.

17. The instances where Officer Reid used profanity against the Wrights, while certainly not to be encouraged, were nonetheless reasonable under the circumstances.[7]

18. In the basement-bedroom, when Sergeant Moore confronted Michelle Cruz, it is more likely than not that he was standing several feet away from her, while holding his semi-automatic rifle. Given the circumstances, particularly his reasonable belief that illegal firearms were being hidden in the basement, it was acceptable for Sergeant Moore to threaten the use of deadly force against Michelle Cruz.

19. It was also reasonable for Sergeant Moore to order Michelle Cruz to drop the bed sheet in order to make sure that she was not concealing a weapon, despite her protestations that she was unclothed.

20. Given the fact, however, that Michelle Cruz was obviously unclothed before she put on her nightshirt, and given that there was no opportunity for Cruz to obtain a weapon while she was being observed by several police officers, it was unreasonable for Officer Berkowitz to perform a subsequent pat-down search of Michelle Cruz.

21. Lieutenant Berberich acted reasonably in informing Patricia and Tyrone Wright that they would receive a copy of the warrant after the search was completed. There is no evidence to indicate that the U.S. Park Police was under a duty to furnish plaintiffs with the search warrant immediately.

22. During the room-by-room search of the house, it is more likely than not that the U.S. Park Police negligently damaged several pieces of jewelry belonging to the Wrights, and various photographs and picture frames belonging to the Cruzes. The total damage to the Wrights' property amounted to $585.00. The total damage to the Cruzes' property amounted to $165.00.

23. It is also more likely than not, however, that the damage allegedly done to certain dressers and drawers belonging to the Wrights was pre-existent, and not caused by any of the police officers.

24. After Justo Cruz was arrested and taken to the local police station for booking, it was unreasonable for the desk clerk on duty to keep him in custody at the municipal jail overnight. According to the standard of care, as expressed by Lieutenant Berberich, Justo Cruz should have been issued a citation and then released. *See also* U.S. Park Police General Order 2013 .08 ("An arrestee shall not be detained longer than is reasonable and necessary for the circumstances surrounding the case.") (admitted into evidence as Pls.' Ex. 16).

### III.

Under the Federal Tort Claims Act, the United States may be held directly liable for the torts of its employees committed during the course of their employment. There is no dispute here that the police officers who sought the warrant and conducted the search of 437 Kenyon Street on March 10, 1992 were acting within the scope of their employment for the United States. The only question is whether those actions constituted a breach of the common law as it is articulated by the District of Columbia courts and, more generally, by the American Law Institute's Restatement (Second) of Torts. Plaintiffs allege that the U.S. Park Police committed the common law torts of intentional and negli-

---

7. The regulations of the U.S. Park Police provide that "[a]n officer shall maintain decorum, command of temper, and exercise patience and discretion at all times. Harsh, violent, profane, or insolent language shall not be used." *See* U.S. Park Police General Order 31.01 (admitted into evidence as Pls.' Ex. 13). Although that proscription is relevant to a determination of the appropriate standard of care, it is not controlling. *See District of Columbia v. White*, 442 A.2d 159, 163–64 (1982).

gent infliction of emotional distress, negligence, and trespass.

## A.

█ Before considering those claims, however, one issue should be addressed at the outset regarding the actions of Sergeant Marsh, Officer M. Smith, and Officer Reid in obtaining a search warrant.[8] Perhaps the most disturbing aspect of this case was the failure of the U.S. Park Police to inform Judge Queen fully of the relevant facts to support their application for a search warrant. Sergeant Marsh intentionally omitted material information from his affidavit, in particular, the fact that Officers M. Smith and Reid had failed to accomplish a controlled buy of narcotics from 437 Kenyon Street. Sergeant Marsh testified that this omission was prompted by the advice of an unnamed Assistant United States Attorney.

By selectively presenting the facts to Judge Queen, it is possible that Sergeant Marsh was able to obtain a facially-valid search warrant more easily than if he had disclosed all of the relevant facts, as he should have. In this case, however, the search warrant issued by Judge Queen authorized a search for weapons, not narcotics. Therefore, under the totality of the circumstances, it is more likely than not that the same warrant would have issued even if the information regarding the failed controlled buy had been included by Sergeant Marsh.

The foregoing analysis of this topic does not in any why demean the off-repeated principle that the Fourth Amendment carries a strong presumption in favor of requiring a "neutral and detached magistrate" to review applications for search warrants. *See Coolidge v. New Hampshire,* 403 U.S. 443, 449, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); *United States v. Lefkowitz,* 285 U.S. 452, 464, 52

S.Ct. 420, 423, 76 L.Ed. 877 (1932). This safeguard is designed to ensure that the machinery of the State will not be placed into motion without a judicial determination of probable cause. The judiciary must be alert to police officers' attempts to circumvent this important safeguard by failing to present the magistrate with an affidavit that portrays the totality of the relevant circumstances. *See Franks v. Delaware,* 438 U.S. 154, 164–72, 98 S.Ct. 2674, 2680–85, 57 L.Ed.2d 667 (1978).

█ The case law appears to support a cause of action where a police officer has intentionally obtained a search warrant in violation of the Constitution. *See Malley v. Briggs,* 475 U.S. 335, 343–44, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986); *Rivera v. United States,* 928 F.2d 592, 604 (2d Cir. 1991); *Branch v. Tunnell,* 937 F.2d 1382, 1387 (9th Cir.1991). Such a claim, however, arises directly under the Fourth Amendment and must be pursued in a *Bivens*-type action against the individual police officer. In this case, the individual officers were granted qualified immunity prior to trial, *i.e.,* before any evidence was placed in the record regarding the questionable application for a search warrant. It is unfortunate that plaintiffs did not raise this issue at the qualified immunity stage. Their failure to do so, however, is conclusive. The claims against the individual defendants have already been dismissed with prejudice. *See Wright v. United States,* Civ. A. No. 95–0274 (D.D.C. Feb. 8, 1996) (order granting qualified immunity). It is not possible now to re-visit the *Bivens* claims. *Cf. Mitchell v. Forsyth,* 472 U.S. 511, 525–27, 105 S.Ct. 2806, 2814–16, 86 L.Ed.2d 411 (1985) (primary purpose of qualified immunity is to avoid subjecting individual police officers to litigation and trial).[9]

█ Nor is the conduct here of the individual police officers actionable under the FTCA. In general, the FTCA does not recog-

---

8. Although this claim was not raised directly by plaintiffs in their complaint, substantial evidence was introduced on the topic at trial.

9. In light of the above ruling, no opinion is expressed as to whether the evidence presented at trial would have warranted a verdict against the individual officers under *Bivens,* particularly in light of their alleged reliance on the legal advice of an Assistant United States Attorney. *See Rivera,* 928 F.2d at 604 (plaintiffs must show that police officer acted with "deliberate falsehood" or "reckless disregard for the truth" in submitting inaccurate affidavit in support of warrant).

nize a right of action where there is no private analog. *See* 28 U.S.C. § 1346(b) (1994); *id.* § 2674 (liability of United States shall be "in the same manner and to the same extent as a private person under like circumstances."). The act of applying for a search warrant has no analogous counterpart for private citizens. This is not to say, however, that an action cannot be held in trespass for the execution of an invalid search warrant; but the discrete act of applying for such a warrant is not reviewable under the FTCA. *See FDIC v. Meyer,* 510 U.S. 471, 477–78, 114 S.Ct. 996, 1001–02, 127 L.Ed.2d 308 (1994) (FTCA does not cover federal constitutional torts).

Moreover, the FTCA contains a "discretionary function" exception. *See* 28 U.S.C. § 2680(a) (1994). Recently, the D.C. Circuit held that the United States could not be held liable under the FTCA where a prosecutor had concealed exculpatory information from a grand jury. *See Moore v. Valder,* 65 F.3d 189, 196–97 (D.C.Cir.1995); *see also Gray v. Bell,* 712 F.2d 490, 515–16 (D.C.Cir.1983). As the Court stated in *Moore,* "identifying the evidence to submit to a grand jury . . . [is an] action that require[s] the prosecutor to exercise his professional judgment. [It is] therefore quintessentially discretionary." *Moore,* 65 F.3d at 197. That situation is closely akin to the one at hand. Submitting evidence to a grand jury for a determination of probable cause is similar to submitting an affidavit to a magistrate for the same purpose. The only significant differences are that one act is performed by a prosecutor and culminates in an indictment, whereas the other is performed by a police officer and culminates in a warrant.

Yet as the Supreme Court and the D.C. Circuit have admonished, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984); *see Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1195–96 (D.C.Cir.1986); *cf. Pooler v. United States,* 787 F.2d 868, 870–71 (3d Cir.1986) (police officer exercised discretionary func-

tion in deciding how to proceed with investigation). If the function of identifying what evidence to submit to a judicial tribunal is discretionary for prosecutors, *see Moore,* 65 F.3d at 197, it should be similarly discretionary for police officers. Thus, given that sovereign immunity applied in *Moore*—where the prosecutor had allegedly "concealed and distorted exculpatory evidence," *see id.*—the United States shall, in accordance with that precedent, be found to be immune from suit here.

#### B.

Turning now to the remainder of plaintiffs' claims. there is no question that the FTCA creates a right of action for torts committed during the unreasonable execution of a search warrant. *See* 28 U.S.C. § 2680(h) (permitting liability for intentional torts committed by law enforcement officers). The analogous common law claims may fall, as alleged here, under the rubrics of intentional or negligent infliction of emotional distress, negligence, or trespass. Each of those four claims will be considered seriatim.

#### 1.

■■■ With regard to the claim for intentional infliction of emotional distress, plaintiffs must prove that they suffered "(1) extreme and outrageous conduct on the part of the defendant[s] which (2) intentionally or recklessly (3) cause[d] the plaintiff[s] severe emotional distress." *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C.1994); *see Washington v. John T. Rhines Co.,* 646 A.2d 345, 349 (D.C.1994). As stated above, the findings of fact compel a legal conclusion in favor of the United States on that claim. Based on an assessment of the evidence, including a determination of the various witnesses' credibility, plaintiffs have failed to show by a preponderance of the evidence that the U.S. Park Police engaged in any actions that could be characterized as "extreme and outrageous." *See Drejza,* 650 A.2d at 1312 ("The requirement of outrageousness is not an easy one to meet.").

The preponderance of the evidence supports a finding that none of the officers used excessive force in the course of subduing plaintiffs. Although it is more likely than

not that some of the officers used profanity, the use of such language, under the circumstances, does not rise to the level of extreme and outrageous conduct. *See id.* at 1312 n. 10 (conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' ") (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Similarly, the second pat-down search of Michelle Cruz and the overnight detention of Justo Cruz, while perhaps unnecessary and certainly regrettable, were not so unreasonable as to be extreme and outrageous. Finally, despite the fact that, during their search, the U.S. Park Police damaged several items of the Wrights' and Cruzes' personal property, such damage appears to have been negligently caused, and not the product of willfulness or malice. Accordingly, on the claim for intentional infliction of emotional distress, judgment will be entered in favor of the Government.

### 2.

▮ Next, on the claim for negligent infliction of emotion distress, in order for plaintiffs to prevail, they must prove (1) that the U.S. Park Police acted negligently, (2) that plaintiffs suffered either a physical impact or were within the "zone of danger" of the officers' actions, and (3) that they suffered emotional distress that was "serious and verifiable." *See Jones v. Howard University, Inc.*, 589 A.2d 419, 424 (D.C.1991); *Williams v. Baker*, 572 A.2d 1062, 1067–68 (D.C.1990) (en banc). In this case, there was sufficient evidence to prove that the U.S. Park Police acted negligently in (1) subjecting Michelle Cruz to a second, unnecessary pat-down search; (2) requiring Justo Cruz to spend the night in police custody instead of releasing him; and (3) damaging the Wrights' and Cruzes' personal property during the course of searching for illegal firearms. Moreover, in the first two of those situations, it is apparent that there was a physical intrusion perpetrated on the relevant plaintiff.[10] The only question that remains is whether Michelle and Justo Cruz

suffered emotional distress that was "serious and verifiable."

▮ The D.C. courts have admonished that not every "trifling distress" should result in a recovery of damages. *See Williams*, 572 A.2d at 1068. "[T]ransitory, non-recurring physical phenomena ... such as dizziness, vomiting, and the like, do[ ] not make the actor liable where such phenomena are in themselves inconsequential and do not amount to substantial bodily harm." *Id.* (quoting Restatement (Second) of Torts § 436A cmt. c (1965)); *see also Jones*, 589 A.2d at 424. In this case, both Michelle and Justo Cruz testified that they suffered from recurrent nightmares for several weeks; and Justo Cruz described how, for a while, he was constantly nervous and easily startled by loud noises. Of course, most of that emotional trauma should be attributed to the overall manner in which the U.S. Park Police entered and searched 437 Kenyon Street, with their accompanying display of firearms and use of force. As stated before, however, those actions were reasonable under the circumstances and given the information possessed by the police officers at the time.

It is difficult to isolate the specific quantum of emotional distress that is attributable solely to the negligent acts of the U.S. Park Police. It appears, however, to be a relatively insubstantial amount of psychological harm. The majority of physical symptoms experienced by Michelle and Justo Cruz— nightmares, an inability to sleep, and excessive nervousness—are more commonly, associated with being awakened suddenly at night and threatened with deadly force, rather than being subjected to a mere frisk or an overnight stay in jail. Based on the totality of the circumstances, therefore, it is more likely than not that the emotional distress that was negligently caused was minimal and not "serious and verifiable." Accordingly, on the claim for negligent infliction of emotional distress, judgment ill be entered in favor of the Government.

---

10. With regard to the third situation, involving the damage to plaintiffs' personal property, the evidence does not support a finding that the

Wrights or Cruzes were either physically impacted or within any "zone of danger" at the time that their house was being searched.

### 3.

Third, with regard to the negligence claim, the only actions of the U.S. Park Police that breached a duty of care owed to plaintiffs are those three mentioned above: the second pat-down search of Michelle Cruz, the overnight detention of Justo Cruz, and the damage done to the Wrights' and Cruzes' personal property. *See District of Columbia v. Evans*, 644 A.2d 1008, 1021 (D.C.1994) (police officers may be held liable for negligent handling of arrest situation). None of those actions, however, resulted in any significant or lasting harm. The physical and psychological discomfort experienced by Michelle Cruz, while being subjected in her bedroom to a quick pat-down search by a female officer, was fleeting and not overly intrusive. Therefore, her compensation will be minimal.

The claim asserted by Justo Cruz is somewhat more substantial. According to the testimony of Lieutenant Berberich, the senior ranking police officer, it was a "screw-up" for the desk clerk on duty to keep Cruz in jail overnight.[11] The evidence indicates that Cruz was unnecessarily subjected to eight hours of incarceration, when he should have been simply issued a citation and released. Accordingly, Cruz will be compensated for the damage to his liberty interest that was suffered during his overnight stay in jail. Lastly, with regard to the alleged property damage, the evidence indicates that the police officers acted negligently in the course of searching the house, opening drawers and closets, and removing and inspecting items of personal property. Therefore, the Wrights and Cruzes will be awarded compensatory damages for their property loss.

### 4.

Finally, in order to prevail on their trespass claim, plaintiffs must prove (1)

that a trespass to realty occurred, and (2) that such action was tortious or unauthorized. *See Hammel v. Little*, 87 F.2d 907, 912 (D.C.Cir.1936). In *Hammel*, however, the Court held that where the intruder is an executive officer armed with a valid search warrant, that officer has legal authority to enter and search the premises. The presence of a warrant thus constitutes a complete defense to a suit for trespass. In this case, as stated above, although there were questions about the manner in which the U.S. Park Police obtained a search warrant, the warrant issued by Judge Queen was valid and enforceable. Accordingly, the claim for trespass will be dismissed.

### IV.

The issue of calculating damages on the negligence claims will be held under advisement pending further briefing from the parties. Since the data on damages is best known to the Government, it will be directed to file a supplemental memorandum, describing any precedent—administrative or judicial—on which to base a determination of damages. Plaintiffs will be given an opportunity to respond.

### *Conclusion*

Viewing the action of each officer in isolation, it is clear that no one of them acted unreasonably in the circumstances. Moreover, although the raid developed no evidence of drug sales or a multiplicity of weapons, the team recovered one lethal and illegal handgun in the possession of Cruz, who had used it that day to force Pinkney off the Kenyon Street premises. The sudden intrusion of a dozen heavily-armed police in black combat gear into a residence in the middle of the night is, for the occupants, a terrifying

---

11. Because the desk clerk had probable cause to imprison Cruz, based on his unlawful possession of a firearm in the District of Columbia, there can be no liability for false arrest or false imprisonment here. *See Taylor v. District of Columbia*, 691 A.2d 121, 125 (D.C.1997) (plaintiff must show lack of probable cause in order to prevail on claim for false arrest or false imprisonment).

Nonetheless, an award of damages may still be possible based on a finding of negligence. *See*

*Occhino v. United States*, 686 F.2d 1302, 1306 (8th Cir.1982) (United States held liable for negligently extending plaintiff's detention); *cf. Evans*, 644 A.2d at 1020 (police officers who shot plaintiffs son were not liable for assault and battery, but could still be held liable for negligence); *District of Columbia v. Downs*, 357 A.2d 857, 859–60 (D.C.1976) (same).

experience. It is an extreme use of government power, which must be carefully controlled, initially by police leadership, and where necessary by the courts at the warrant stage and ultimately in litigation.

On the other hand, the informant's report of an arsenal, and the police observation of Cruz holding a gun while removing Pinkney from the Kenyon Street premises fully justified the prompt deployment of overwhelming force to enter, search, disarm anyone with a weapon, and maintain control of the premises and its occupants until any weapons had been recovered and those in possession placed under arrest.

In hindsight, the police officers involved might have been more skeptical of Pinkney. They might have placed the premises under surveillance to arrest Cruz when he emerged. Indeed, there is a question of why if the officers in the van earlier in the day saw Cruz with a gun while holding Pinkney, they did not disarm and arrest Cruz at that time. They might have treated those plainly unarmed more gently. There is no suggestion, however, of improperly motivated police harassment, particularly in light of the constant danger confronted daily and, too often fatally, by police in the District of Columbia. The deployment of the force and its actions were not unreasonable within the meaning of the Constitution, nor have plaintiffs carried their burden of proving the violation of any professional standard of care, except with regard to the second pat-down of Michelle Cruz, the extended detention of Justo Cruz, and the property damage to the Wrights' and Cruzes' personalty.