[No. 79252-6.    En Banc.]
Argued January 17, 2008.        Decided October 2, 2008.

Leo C. Brutsche, *Petitioner*, v. The City of Kent,
*Respondent*.

666

*John R. Muenster* (of *Muenster & Koenig*) and *Jerald A. Klein*, for petitioner.

*Chloethiel W. Deweese* (of *Keller Rohrback, LLP*) and *Richard B. Jolley*, for respondent.

*Sofia D'Almeida Mabee* and *Daniel B. Heid* on behalf of Washington State Association of Municipal Attorneys, amicus curiae.

*Jason C. Kinn, Nancy L. Talner,* and *Sarah A. Dunne* on behalf of American Civil Liberties Union of Washington, amicus curiae.

*William R. Maurer* and *Michael E. Bindas* on behalf of Institute for Justice–Washington State Chapter, amicus curiae.

¶1 MADSEN, J. — In executing a search warrant for a suspected methamphetamine lab on premises owned by petitioner Leo C. Brutsche, law enforcement officers using a battering ram to gain entry caused physical damage to doors and doorjambs. Mr. Brutsche brought suit against the city of Kent (City), among others, arguing that the officers had a duty to conduct the search so as to avoid unnecessary damage and do the least damage to the property consistent with a thorough investigation, that they breached this duty, and that the City is liable for the damage. The trial court granted summary judgment in favor of the City and the Court of Appeals affirmed the decision. We hold that although a trespass claim may be asserted against a city alleging that law enforcement officers exceed the scope of their lawful authority to enter property to execute a search warrant, summary judgment in this case was proper because as a matter of law the officers did not commit trespass as Mr. Brutsche contends. We also hold that summary judgment was properly granted with respect to Mr. Brutsche's claim that the damage to his property constituted a taking of private property for which the City must pay just compensation and decline to overrule *Eggleston v. Pierce County*, 148 Wn.2d 760, 64 P.3d 618 (2003).

## FACTS

¶2 On July 8, 2003, a King County District Court judge signed a search warrant authorizing the search of an aban-

doned warehouse, several outbuildings, eight semitrailers, and a mobile home on property in Kent owned by Mr. Brutsche. The warrant also authorized police to search James F. Brutsche (Leo Brutsche's son), locked containers, and numerous abandoned or disabled vehicles within the fenced boundary of the property. It authorized the seizure of controlled substances, including methamphetamine, as well as paraphernalia and equipment used in connection with the manufacture and distribution of methamphetamine and other specified items.

¶3 On July 10, 2003, the Valley Special Response Team (SRT), a multijurisdictional group of law enforcement officers from several south King County law enforcement jurisdictions, executed the search warrant. The SRT was called on to execute the warrant because of its training for special situations, including serving high risk warrants. The search warrant for Mr. Brutsche's property was considered to be high risk because "it involved a search for the manufacture of methamphetamines and the apprehension of subjects in the methamphetamine trade." Clerk's Papers (CP) at 44 (Decl. of Darren Majack, a Kent patrol officer who was a member of the SRT executing the search warrant); *see* CP at 47 (Decl. of Mike Villa, a lieutenant with the Tukwila Police Department, who was commander of the SRT) (the SRT is used for executing warrants at high risk sites such as methamphetamine lab sites, which "are known to be dangerous and volatile and pose a significant risk to officer safety").

¶4 When the SRT arrived at the property in marked vehicles and wearing police uniforms, James Brutsche ran from an outdoor area into the mobile home and attempted to barricade himself and another suspect in the home by placing a dowel in the sliding glass door. He ran from the SRT "despite an announcement, repeated three times over the loud speaker from one of the vehicles, that the police had arrived and had a search warrant." CP at 44 (Decl. of Majack).

¶5 The SRT "almost immediately" breached the glass door of the mobile home with a battering ram. *Id.* Officer Majack stated that this tactic was necessary because SRT did not know if James Brutsche was arming himself or rallying unaccounted-for individuals in the mobile home to engage police in a fight, and to minimize the likelihood that evidence was being destroyed. CP at 44-45; *see* CP at 47, 48 (Decl. of Villa) ("[m]ethamphetamine users are typically paranoid, will act in an irrational fashion, and are often armed to protect themselves from other criminals"). James Brutsche was combative and resistant, and officers used a "taser" to subdue him. CP at 45 (Decl. of Majack); CP at 49 (Decl. of Villa).

¶6 The SRT also decided it was necessary to enter other structures on the property immediately because they provided possible cover and concealment for unknown persons and to prevent possible destruction of evidence. Lieutenant Villa said that while the doors of some structures were unlocked, several were locked and thus it was necessary to breach these doors with the battering ram. CP at 49 (Decl. of Villa). He stated that although he did not see Leo Brutsche at the scene, as the SRT commander he would not have permitted Mr. Brutsche access to the property during the search because

> [a]s a matter of standard operating procedure, the SRT does not allow access in or out of a potential crime scene until a search has been completed. This procedure not only maintains the integrity of the potential crime scene, but also ensures the safety of innocent bystanders in a potentially high risk environment.

CP at 50.

¶7 Mr. Brutsche maintains the destruction of many of his doors and doorjambs was unnecessary. He stated, "At the time of the raid, I offered my keys to the officer in charge, Sergeant Jaime Sidell.[1] I offered to escort the officers around my property and open all doors for them. Sergeant

---

[1] Sergeant Sidell was not, however, the officer in charge, as explained.

Sidell rejected my offer, saying, " '. . . we have our own way of getting in.' " CP at 89 (Certification of Leo C. Brutsche). Mr. Brutsche added that use of his keys would be quicker and quieter, making the entry safer for the officers, and would not damage the doors and door frames. *Id.* He said that he knew there were no illegal drugs or weapons on the property and offered to escort the officers at the time of the search because there were no genuine officer safety concerns or any illegal activities. Mr. Brutsche hired a carpenter to repair the doors and doorjambs damaged in the raid, at a cost of $4,921.51. The SRT did not seize any evidence.

¶8 Mr. Brutsche brought this action against King County and the City, asserting several claims, among them claims of trespass, negligence, and a taking of property without just compensation.[2] In November 2004, the matter was transferred to arbitration. The parties stipulated to dismissal of King County, which settled with Mr. Brutsche prior to the arbitration hearing. The arbitrator awarded $2,400 to Mr. Brutsche, plus costs.

¶9 Mr. Brutsche moved for a trial de novo in superior court. The City moved for dismissal under CR 12(b)(6). This motion was denied. On June 24, 2005, the City moved for summary judgment. A month later the court granted this motion. The City also moved for an award of $27,124 in attorney fees under MAR 7.3 because Mr. Brutsche did not improve his position. On September 16, 2005, the court awarded the City attorney fees of $4,050.

¶10 Mr. Brutsche appealed; the City cross-appealed the amount of attorney fees. The Court of Appeals affirmed the grant of summary judgment but remanded on the attorney fee issue for development of a record for review. The Court of Appeals awarded the City attorney fees on appeal under MAR 7.3 because Mr. Brutsche appealed and again failed to improve his position. *Brutsche v. City of Kent,* noted at 134

---

[2] Mr. Brutsche and the Estate of James Brutsche filed an unsuccessful civil rights suit in federal court against the Port of Seattle, the cities of Auburn, Federal Way, Kent, Renton, and Tukwila, and individual law enforcement officers who participated in the raid and search of Mr. Brutsche's property.

Wn. App. 1002, 2006 WL 1980216, 2006 Wash. App. LEXIS 1499, *review granted*, 160 Wn.2d 1017 (2007).

¶11 We limited review to Mr. Brutsche's common law negligence and trespass claims and his takings claims under the state and federal constitutions.

¶12 Summary judgment is reviewed de novo. *Osborn v. Mason County*, 157 Wn.2d 18, 22, 134 P.3d 197 (2006). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Evidence is construed in the light most favorable to the nonmoving party. *Osborn*, 157 Wn.2d at 22.

## ANALYSIS

¶13 Mr. Brutsche maintains that pursuant to this court's decision in *Goldsby v. Stewart*, 158 Wash. 39, 290 P. 422 (1930), the City is liable in negligence. In *Goldsby*, the court stated that law enforcement officers executing a search warrant have a duty to conduct a search in a reasonable manner and avoid unnecessary damage to property of innocent third parties. We agree that *Goldsby* is sound authority, but it is authority favoring Mr. Brutsche's trespass claim, not negligence.[3]

¶14 Under *Goldsby*, which has never been overruled, and the *Restatement (Second) of Torts* (1965), a city may be liable in trespass for unnecessary damage to property caused by its law enforcement officers executing a search warrant, on the theory that unreasonable damage to the property exceeds the privilege to be present on the

[3] The Court of Appeals refused to consider *Goldsby* on the ground that Mr. Brutsche did not cite it until his reply brief in that court and the City had not had an opportunity to address it. The court considered the case the equivalent of raising a new issue in a reply brief. *Brutsche*, 2006 WL 1980216, at *4, *5, 2006 Wash. App. LEXIS 1499, at *9. The refusal to consider the case on this basis was erroneous, however, because parties can clearly cite additional authority on appeal in support of issues they have already raised. While *Goldsby* is not authority supporting Mr. Brutsche's negligence claim, it is authority supporting his trespass claim.

property and search. In *Goldsby*, the plaintiffs owned a building and had rented the upper half to a tenant. *Goldsby*, 158 Wash. at 39. Law enforcement personnel from Snohomish County and the city of Everett searched the upper level premises for alcoholic beverages pursuant to a valid search warrant. *Id.* In the course of the search, the officers allegedly damaged the building and removed an entrance door to the second floor. *Id.* at 40. The plaintiffs brought suit against the sheriff of Snohomish County and two deputies, the Everett commissioner of public safety, and the Everett chief of police, seeking damages for injuries to the building. *Id.* at 39.

¶15 At the close of evidence, the court granted the defendants' motion for dismissal. *Id.* at 40. The plaintiffs appealed, arguing that the court invaded the province of the jury and decided the case itself on disputed facts. *Id.* This court agreed, holding that the trial court erred in ruling as a matter of law that the plaintiffs had failed to present a case for the jury, and reversed and remanded for a new trial. *Id.* at 42. The court stated the law as follows: "In executing a search warrant, officers of the law should do no unnecessary damage to the property to be examined, and should so conduct the search as to do the least damage to the property consistent with a thorough investigation." *Id.* at 41. The court said that "[i]t was for the jury to say whether or not [the officers] had, in searching appellants' property, unnecessarily damaged the same, and thereby rendered themselves liable to appellants." *Id.* at 41-42.

¶16 The only authorities cited in *Goldsby* for the rule of law concerning unnecessary damage are *Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L. Ed. 581 (1849), *Buckley v. Beaulieu*, 104 Me. 56, 71 A. 70 (1908), and 24 *Ruling Case Law* § 11, at 708 (William M. McKinney & Burdette A. Rich eds., 1919). *Goldsby*, 158 Wash. at 41. Both of the cited cases involved actions of trespass quare clausum.[4] An action in "trespass

---

[4] Like Mr. Brutsche, the American Civil Liberties Union of Washington treats *Goldsby* as a negligence case, and says that in *Buckley*, cited in *Goldsby*, the Supreme

quare clausum fregit" is "[a]t common law, an action to recover damages resulting from another's unlawful entry on one's land that is visibly enclosed. . . . Also termed *trespass to real property; trespass to land.*" BLACK'S LAW DICTIONARY 1542 (8th ed. 2004).[5] The treatise cited in *Goldsby* in turn cites and quotes the same two cases that the court cited. There is no mention in *Goldsby* of negligence; it is a trespass case.[6]

¶17 Therefore, under *Goldsby*, if officers executing a search warrant unnecessarily damage the property while conducting their search, that is, if they damage the property to a greater extent than is consistent with a thorough investigation, they exceed the privilege to be on the land and liability in trespass can result.

¶18 *Restatement (Second) of Torts* § 214 leads to the same result. A person is liable for trespass if he or she intentionally (1) enters or causes another person or a thing to enter land in the possession of another or (2) remains on the land or (3) fails to remove from the land a thing that he or she is under a duty to remove. *See Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d 677, 681-84, 709 P.2d 782

---

Court of Maine observed that an action could sound in negligence for an unreasonable search. *Amicus Curiae* Br. of Am. Civil Liberties Union of Wash. at 5. The opening sentence in *Buckley* is, however: "Action of trespass quare clausum for an alleged breaking and entering of the plaintiff's dwelling house." *Buckley*, 104 Me. at 56. The case never mentions negligence, and concludes that "[u]pon the[ ] facts we think it clear that the manner and extent of the search in this case were unreasonable and in excess of the officers' authority." *Id.* at 61. The court's reasoning that the trespass claim was permitted is like the law stated in the *Restatement (Second) of Torts* § 214(1), discussed below, recognizing liability for trespass when officers executing a search warrant engage in unreasonable acts beyond their privilege to enter property under a search warrant.

[5] *See also* THE LAW DICTIONARY 394 (Anderson Publ'g 1997) ("trespass quare clausum fregit, *i.e.*, entry on another's close (*q.v.*), or land without lawful authority").

[6] The parties' briefs submitted in *Goldsby* do not mention negligence, either. The plaintiffs-appellants cited only the same two cases that this court cited in its opinion, Appellants' Opening Brief at 4-7, *Goldsby v. Stewart*, No. 22392 (Wash. Sup. Ct.), *reprinted in* 1 Briefs 158 Wash. (1930), and the defendants-respondents said they had no quarrel with the law stated in the appellants' brief, Respondents' Brief at 15-16, *Goldsby, supra.*

(1985) (applying RESTATEMENT (SECOND) OF TORTS § 158).[7] Liability for damage may arise under section 214(1), which provides that "[a]n actor who has in an unreasonable manner exercised any privilege to enter land is subject to liability for any harm to a legally protected interest of another caused by such unreasonable conduct." *See Fradkin v. Northshore Util. Dist.*, 96 Wn. App. 118, 123, 977 P.2d 1265 (1999) (quoting § 214(1) cmt. a).

¶19 We adopt section 214 as an accurate statement of the law that applies to trespass claims involving execution of search warrants on private property.

¶20 Comment a to section 214(1) explains that

[a] privilege to enter land may be unreasonably exercised either by the intentional doing of an act which a reasonable man would not regard as necessary to effectuate the purposes for which the privilege is given, or by any negligence in the manner in which the privilege is exercised. Subsection (1), therefore, applies not only where the actor deliberately abuses his privilege by doing an act which he recognizes as unnecessary or deliberately does an act which a reasonable man would so recognize, but also where the actor does not use reasonable care to prevent the exercise of his privilege from involving an unreasonable risk of harm to the legally protected interests of others.

¶21 As the comment explains, the type of conduct giving rise to liability under section 214(1) can be either intentional or negligent misconduct, but the action itself is a trespass action. The City concedes that its conduct was intentional; it did not accidentally breach doors with the battering ram. We agree that the conduct giving rise to the injury to Mr. Brutsche's property was intentional because

---

[7] Significantly, the intent required is used to mean " 'that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.' " *Bradley*, 104 Wn.2d at 682 (quoting RESTATEMENT (SECOND) OF TORTS § 8A). Intent is not limited to consequences that are desired. *Id.* Instead, if the actor knows that the consequences are certain or substantially certain to result and still goes ahead, he is deemed to have desired to produce the result. *Id.*

the law enforcement officers intentionally and deliberately used battering rams to breach doors.

¶22 The City argues, however, that no trespass occurred because it had a valid, judicially issued warrant that authorized the police to open locked containers during the course of the search. As *Restatement (Second) of Torts* § 210 provides, the privilege to execute an order of a court to do any act on the land "carries with it the privilege to enter the land for the purpose of executing the order." Comment a to section 210 states, however, "As to the actor's liability for harm done by his unreasonable manner of exercising the privilege stated in this Section, see § 214(1)." Thus, under the *Restatement (Second) of Torts* § 210, section 214(1) applies even if the entry onto the property is initially lawful for purposes of a search pursuant to a valid warrant.[8] The fact that a valid warrant exists is not an automatic bar to a trespass claim.

¶23 Under *Restatement (Second) of Torts* § 214(1), and in light of *Goldsby*, Mr. Brutsche's trespass claim is a proper cause of action. *See also* 68 AM. JUR. 2D *Searches and Seizures* § 309 (2000) ("the victim of an unlawful search and seizure has available the remedy of trespass"); *see, e.g., Sovich v. State*, 92 Ind. App. 103, 167 N.E. 145, 146 (1929) (recognizing that officers executing a valid search warrant may be liable in damages for acts constituting a malicious trespass); *Richardson v. Henderson*, 26,622 (La. App. 2 Cir. 3/1/95); 651 So. 2d

---

[8] One court has stated that the presence of a valid search warrant is a complete defense to a suit for trespass. *Wright v. United States*, 963 F. Supp. 7, 19 (D.D.C. 1997). But the authority cited in *Wright* for this proposition does not support the conclusion. The court relied on *Hammel v. Little*, 66 App. D.C. 356, 87 F.2d 907, 912 (D.C. Cir. 1936). In *Hammel* property was seized for violation of the internal revenue laws, and upon acquittal of the owner, the property was returned. He brought a claim of trespass, claiming that probable cause is never justification for an illegal seizure. *Id.* at 908. The court rejected this argument, reasoning that the relevant question is whether the seizure was lawful and proper, and under civil rules of evidence this question had been resolved against the plaintiff even though he had been acquitted. *Id.* at 912. The court also said, however, that it has "never been the law that trespass will lie for an act of seizure unless it appears that the act was tortious or unauthorized." *Id.* Given this explanation, *Hammel* cannot be said to support a blanket defense because of the presence of a valid warrant.

501, 504-06 (relying on general principles in 68 Am. Jur. 2d *Searches and Seizures* § 229 (1993) that execution of a search warrant must be carried out in an orderly manner and liability in trespass may result if the officers executing the warrant exceed their authority or wantonly destroy property in making their search; here, officers "thoroughly 'trashed' " the plaintiffs' home, including spilling flour, splattering eggs on the floor, and tossing bags of chips and candy across the living room; judgment for plaintiffs affirmed an amount to clean the home and to compensate for emotional distress); *Onderdonk v. State*, 170 Misc. 2d 155, 162-64, 648 N.Y.S.2d 214 (1996) (permitting recovery pursuant to a trespass claim of compensatory damages for damage to the plaintiff's property resulting from an unreasonably conducted search); *Moore v. Kilmer*, 185 Okla. 158, 90 P.2d 892, 893 (1939) (implicitly recognizing cause of action for trespass: an officer " 'is not liable as a trespasser for executing the [warrant] in an orderly manner' "; evidence did not support liability (quoting *Knisley v. Ham*, 39 Okla. 623, 623 (syllabus), 136 P. 427 (1913))); *Jackson v. Harries*, 65 Utah 282, 236 P. 234, 236-37, 238 (1925) (damages sustained on basis of unlawful trespass); *Gillmor v. Salt Lake City*, 32 Utah 180, 89 P. 714 (1907) (action for damages for a trespass to property). *But see Wright v. United States*, 963 F. Supp. 7, 19 (D.D.C. 1977) (presence of a valid search warrant is a complete defense to trespass).

¶24 However, we reject Mr. Brutsche's claim that the City is liable under the doctrine of trespass ab initio. This doctrine, which was accepted in the first restatement of torts, has been thoroughly repudiated in *Restatement (Second) of Torts*. "Trespass ab initio" is described as follows:

> He who under *authority of law* enters upon another's land, and is subsequently guilty of an abuse of that authority by committing a wrong of misfeasance against the owner, is deemed to have entered originally without authority, and is therefore liable as a trespasser *ab initio* for the original entry itself, as well as for all damaging acts subsequently done by him thereunder. By the subsequent abuse, he forfeits the

protection which the law would otherwise give to the original entry. The abuse of the authority not only terminates it, but revokes it retrospectively, so that it is deemed never to have existed.

But if one enters under an *authority in fact, given by the owner*, his subsequent abuse of that authority does not make him liable as a trespasser for the original entry. He is liable only for abuse or misconduct occurring after entry.

It has been said that the rule of trespass *ab initio* was "primarily one of procedure," . . . [b]ut the rule did not merely affect the form of action under the old procedure. It created a substantive liability which would not otherwise exist. And "its secondary effect upon the substantive law still remains, *viz.*, that it enables the plaintiff to recover damages for the entire transaction, and not merely for the wrongful portion of it" (the abuse subsequent to the entry).

Jeremiah Smith, *Surviving Fictions*, 27 YALE L.J. 147, 164 (1917) (footnotes omitted) (some emphasis added) (quoting JOHN W. SALMOND, THE LAW OF TORTS: A TREATISE ON ENGLISH LAW OF LIABILITY FOR CIVIL INJURIES 168 (1907)).

¶25 According to *Restatement (Second) of Torts* § 214(2) comment e, the doctrine is a "peculiar and anomalous fiction" having "its origin in the ancient law of distress of property" "in a time of strict rules of pleading, where much subsequent misconduct was not actionable in itself, and it served to afford a remedy where none was otherwise available." Since about 1900, the doctrine has been rejected by the majority of courts. RESTATEMENT (SECOND) OF TORTS app. (reporter's notes). Section 214(2) also rejects the doctrine, providing instead that

[o]ne who properly enters land in the exercise of any privilege to do so, and thereafter commits an act which is tortious, is subject to liability only for such tortious act, and does not become liable for his original lawful entry, or for his lawful acts on the land prior to the tortious conduct.

¶26 Mr. Brutsche acknowledges that section 214(2) rejects the doctrine but maintains that it is still viable in

Washington State.[9] As Mr. Brutsche correctly states, cases applying the doctrine have not been overruled.[10]

¶27 Under the modern view set out in *Restatement (Second) of Torts* § 214, the trespass ab initio doctrine is not only abrogated, it is also unnecessary. An actor who unreasonably exercises the privilege to enter or remain on the land is subject to liability under section 214 regardless of whether the initial entry onto the land is lawful. We take this opportunity to adopt section 214 in its entirety. Accordingly, a trespass action is appropriate under section 214.

¶28 Next, the City contends that summary judgment was proper because reasonable minds cannot differ on the evidence submitted and there was no trespass as a matter of law. We agree.

¶29 Mr. Brutsche contends that the officers exceeded the privilege to be on his land executing the search warrant. He points out that he offered his keys to the officers and offered to escort them around his property and open all doors. He maintains use of his keys would have been quicker and quieter, making entry safer for the officers while avoiding damage to the doors and frames. He states that he knew there were no illegal drugs or weapons on the property and that he offered to accompany the officers because there were no genuine concerns for officer safety.

¶30 However, the evidence submitted by the City establishes that the search was authorized for evidence of methamphetamine manufacture and that such searches are often dangerous. There was also the risk of harm to Mr.

---

[9] The City argues that under *Restatement (Second) of Torts* §§ 204 and 206, breach of the doors is permitted even if the doctrine of trespass ab initio is still viable. These sections are not relevant, however, because they pertain to forcible entry to arrest or apprehend a person and the circumstances under which one entering the land for these reasons may make a forcible entry of a dwelling.

[10] For example, in *Hamilton v. King County*, 195 Wash. 84, 92-93, 79 P.2d 697 (1938), this court applied the doctrine of trespass ab initio when holding that a county was liable for loss of a property owner's season's mink crop when it entered the property without authority and constructed a drainage ditch, and the resulting disturbance in close proximity to the minks' mating pens led to a reduction in mink offspring.

Brutsche if he accompanied the officers, as well as the possibility that his presence would hamper or limit the search. The declarations of SRT Commander Villa and Officer Majack, which are largely uncontroverted, show that it was necessary to breach the doors and that James Brutsche's (Mr. Brutsche's son's) actions dictated the need for the officers' actions. These declarations describe the high risk associated with search warrants for methamphetamine manufacture and the apprehension of individuals in the methamphetamine trade. They explain that James Brutsche was suspected of being involved in the methamphetamine trade, that he tried to barricade himself and another suspect in the mobile home by using a dowel to bar a sliding glass door, and that the officers did not know whether he was arming himself or attempting to rally unknown persons in the home to engage in a fight with police. Further, the declarations describe the danger that evidence would be destroyed before they could search the premises. Villa's declaration also explains that standard operating procedure is to bar access to search scenes during a search, in part to protect innocent bystanders.

¶31 Under these facts, reasonable minds could not differ. The officers did not engage in unreasonable conduct in exercising their privilege to be on the property. We hold that the trial court properly granted summary judgment on the trespass claim.

¶32 Mr. Brutsche also asserted a negligence claim, but in his petition for review and supplemental brief in this court he relies entirely on *Goldsby* as controlling precedent on his negligence claim. Because *Goldsby* is, as explained, a trespass case, and because the actions of the officers in breaching the doors on Brutsche's property were intentional, not accidental, we decline to address the negligence claim.

¶33 We next turn to Mr. Brutsche's takings claim. Mr. Brutsche argues that destruction of property of an innocent third party during execution of a search warrant where no evidence is seized constitutes a compensable

taking under article I, section 16 of the Washington State Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. The Court of Appeals rejected this argument on the ground that under this court's reasoning in *Eggleston*, 148 Wn.2d 760, there is no compensable taking under the state constitution for seizure and preservation of evidence or for destruction of property by the police when executing a search warrant. Mr. Brutsche contends that *Eggleston* is distinguishable.

¶34 Article I, section 16 of the Washington State Constitution provides in part that "[n]o private property shall be taken or damaged for public or private use without just compensation having been first made."

¶35 Contrary to Mr. Brutsche's claim, *Eggleston* is not distinguishable and the Court of Appeals correctly held that no takings occurred given our holding in that case. In *Eggleston*, a property owner brought a claim alleging a taking under article I, section 16 after sheriff's deputies executed a search warrant for her home, uninhabited at the time, pertaining to a murder allegedly committed by her son, Brian. The officers collected evidence, including two walls, removal of which made the house unstable and uninhabitable. Brian was subsequently tried and convicted, but the walls were not used as evidence. The Court of Appeals reversed his conviction, and at the time this court decided *Eggleston*, an order preserving the scene at the house was still in effect and would remain in effect until vacated or modified, or until the criminal case was complete.

¶36 We held in *Eggleston* that the destruction of property by police activity other than collecting evidence pursuant to a warrant is not a takings under article I, section 16. *Eggleston*, 148 Wn.2d at 772-76.[11] We noted there is a split

---

[11] The court reached the substantive takings claim, acknowledging that the parties had not presented a *Gunwall* analysis but noting that a satisfactory *Gunwall* analysis was presented by an amicus and also stating that "the threshold function *Gunwall* performs is less necessary when we have already established a state constitutional provision provides more protection than its federal counter-

of authority in other states as to whether damage of property during a search is a compensable taking but found the analysis of courts in California and Iowa more compelling than those in Texas, Minnesota, and New Jersey.[12] We observed that the California court's opinion is especially important because California's takings clause was a model for Washington's. *Id.* at 772 n.8; *see Customer Co. v. City of Sacramento*, 10 Cal. 4th 368, 895 P.2d 900, 41 Cal. Rptr. 2d 658 (1995).

¶37 Our decision rested on the distinction between police power and the power of eminent domain: " '[e]minent domain takes private property for a public use, while the police power regulates its use and enjoyment, *or if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health and general welfare of the public.*' " *Eggleston*, 148 Wn.2d at 768 (quoting *Conger v. Pierce County*, 116 Wash. 27, 36, 198 P. 377 (1921)). "The gathering and preserving of evidence is a police power function, necessary for the safety and general welfare of society." *Id.*

¶38 Mr. Brutsche contends that *Eggleston* is distinguishable because in his case the police did not seize any evidence and there was no resulting prosecution. This difference is not a basis for distinguishing the case. Because the SRT searched for evidence pursuant to the warrant, *Eggleston*'s analysis applies.

---

part." *Eggleston*, 148 Wn.2d at 767 n.5; *see State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). We have held in other cases that article I, section 16 provides, in some ways, greater protection. *Eggleston*, 148 Wn.2d at 766 (citing *Mfr'd Hous. Cmtys. of Wash. v. State*, 142 Wn.2d 347, 356 n.7, 13 P.3d 183 (2000)). Because it is settled that article I, section 16 is to be given independent effect, it is unnecessary to engage in a *Gunwall* analysis.

[12] In addition to the cases cited in *Eggleston*, courts in two other states have rejected takings claims arising out of destruction of or damage to an innocent property owner's property by police executing search warrants. *Sullivant v. City of Oklahoma City*, 1997 OK 68, 940 P.2d 220, 223-27 (also relying on distinction between police power and a takings; Oklahoma's constitution provides in part that "[p]rivate property shall not be taken or damaged for public use without just compensation," Okla. Const. art. II, § 24); *Certain Interested Underwriters at Lloyd's London Subscribing to Certificate No. TPCLDP217477 v. City of St. Petersburg*, 864 So. 2d 1145 (Fla. Dist. Ct. App. 2003).

¶39 Mr. Brutsche urges that *Eggleston* should be overruled. "A case should be overruled upon 'a clear showing that an established rule is incorrect and harmful.' " *State v. Bradshaw*, 152 Wn.2d 528, 542, 98 P.3d 1190 (2004) (Sanders, J., dissenting) (quoting *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970)). Mr. Brutsche does not make this showing. Rather, for the most part he simply reargues the same arguments that were thoroughly considered and decided in *Eggleston*.

¶40 One contention he makes, however, is that *Eggleston* was wrongly decided because it concludes that compensation cannot be sought and paid after a taking has occurred. He says the constitutional provision is not, however, limited to prior compensation but requires compensation where it is found to be due after the taking has occurred. It is clear, he urges, that an action can be brought to seek compensation after the fact. Mr. Brutsche misunderstands the court's reasoning. The portion of *Eggleston* about which he complains involves an examination of the language of article I, section 16 as part of our inquiry into whether in 1889 when the state constitution was adopted it was intended to require compensation for damage to property during execution of a search warrant. *Eggleston*, 148 Wn.2d at 769. We said, "Article I, section 16 requires *prior* compensation. It would be administratively awkward (and constitutionally unlikely) to require prior compensation for the destruction of property by police while apprehending a suspect or executing a search warrant." *Id.* Stated a little differently, it would be highly problematic for a municipality to exercise eminent domain power and pay compensation in advance for destruction to follow during execution of a warrant. Because this is so, the language of article I, section 16 indicates, as the court reasoned, that compensation was not contemplated for damage occurring during execution of a warrant. We did not say that compensation cannot be sought after a taking has occurred.

¶41 Mr. Brutsche has failed to show that *Eggleston* was wrongly decided, and he has not presented a persuasive

argument for overruling the case. Under *Eggleston*, no compensable taking occurred under article I, section 16.

■ ■ ¶42 Mr. Brutsche also maintains that a taking occurred under the Fifth and Fourteenth Amendments to the United States Constitution. He principally relies on *Wallace v. City of Atlantic City*, 257 N.J. Super. 404, 608 A.2d 480 (Law Div. 1992), a New Jersey case considered by the court in *Eggleston*, and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425-37, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982). He also relies on "cases cited therein" in *Loretto* but does not discuss them or explain how they support his argument.

¶43 Initially, *Wallace* is a trial court decision and therefore of little persuasive value. Under its analysis a search is conducted for a public purpose, with the intended beneficiary being society as a whole, and an innocent third party whose property is damaged should not bear the sole financial burden of the undertaking and must be compensated for the damage. But this analysis is contradicted by *Hurtado v. United States*, 410 U.S. 578, 93 S. Ct. 1157, 35 L. Ed. 2d 508 (1973), in which material witnesses who were jailed to assure they appeared to testify brought a claim for compensation under the Fifth Amendment alleging that their time and liberty had been taken. The Court ruled that every person has a duty to provide evidence and the Fifth Amendment does not require that the government pay for the evidence. *See Eggleston*, 148 Wn.2d at 774-75 (citing *Hurtado*, 410 U.S. at 579, 589). Contrary to the reasoning in *Wallace*, the individual does, under *Hurtado*, bear the burden.[13] *Wallace*'s analysis, being inconsistent with *Hurtado*'s, is not persuasive.

¶44 Mr. Brutsche cites *Loretto* for the principle that a permanent physical invasion of property is a compensable taking under the federal constitution. *Loretto* involved installation of cable television facilities on a landlord's

---

[13] Although we did not decide any Fifth Amendment issues in *Eggleston*, we did say that "it appears to us that [federal courts] would not find the injury to Mrs. Eggleston to be a takings." *Eggleston*, 148 Wn.2d at 774 (citing *Hurtado*, 410 U.S. at 579).

building under a New York City law requiring a landlord to permit installation of such facilities. The Court held that this physical occupation of the plaintiff's rental property was a taking despite the fact the statute might be within the state's police power for the purpose of development of and penetration by a means of communication having educational and community aspects. *Loretto*, 458 U.S. at 425-26. The Court held that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Id.* at 426.

¶45 The Court discussed a number of cases in *Loretto* involving permanent physical occupations, physical invasions short of an occupation, and regulations that restrict the use of property. At the heart of its analysis was the premise that "a permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Id.* at 432. It "is a government intrusion of an unusually serious character." *Id.* at 433. "In short," the Court said, "when the 'character of the governmental action' is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434-35 (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978)).

¶46 Mr. Brutsche maintains that a permanent physical occupation of his property would have resulted had Mr. Brutsche not paid a carpenter to repair the property. But there simply is no permanent physical occupation of property that occurs when police officers damage property during execution of a search warrant, and the holding in *Loretto* does not apply. Mr. Brutsche has not established a taking under the federal constitution.

¶47 The Court of Appeals awarded attorney fees on appeal under MAR 7.3 and RAP 18.1. As the City's request for attorney fees in the Court of Appeals is a continuing

request in this court, RAP 18.1(b), we similarly award fees under MAR 7.3 and RAP 18.1. *See Pudmaroff v. Allen*, 138 Wn.2d 55, 69, 977 P.2d 574 (1999).

¶48 We hold that the trial court properly granted summary judgment to the City with regard to the takings claims and affirm the Court of Appeals on this issue.

## CONCLUSION

¶49 We adopt *Restatement (Second) of Torts* § 214 and conclude that liability in trespass may arise if by intentionally doing an act that a reasonable person would not regard as necessary to execute the warrant and thereby damage the property, or by executing the warrant in a negligent manner and thereby damaging the property, law enforcement officers exceed the scope of their privilege to be on the land to execute a search warrant. Although a trespass action is a permissible cause of action, summary judgment was properly granted in this case because, as a matter of law, on the evidence submitted, the officers did not exceed the scope of their privilege to be on the property to execute the search warrant. We also conclude that Mr. Brutsche is not entitled to assert a takings claim and decline to overrule *Eggleston*. We award attorney fees to the City under MAR 7.3 and RAP 18.1. Finally, we decline to address Mr. Brutsche's negligence claim.

¶50 We affirm the Court of Appeals, under different reasoning, and affirm the trial court's grant of summary judgment.

ALEXANDER, C.J., and C. JOHNSON, OWENS, and FAIRHURST, JJ., concur.

¶51 CHAMBERS, J. (concurring in part and dissenting in part) — I agree with the dissent that there were genuine disputed issues of material fact with respect to Leo Brutsche's claim that law enforcement officers caused unreasonable damage under *Restatement (Second) of Torts* § 214(1) (1965) and *Goldsby v. Stewart*, 158 Wash. 39, 41,

290 P. 422 (1930). *See Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000). Therefore, it was error for the court to grant the government summary judgment on the trespass claim. I would also permit the common law negligence claim to go forward.

¶52 I write separately to stress that there is nothing more reprehensible to the law than an agent of the government causing unnecessary and unreasonable damage to the person or property of a person while performing—or purporting to perform—a government function. It is not necessary that the State and its agents choose the means that causes the least damage, so long as the means chosen is reasonable under all of the circumstances. There may be a legitimate basis for breaking down doors the owner stands ready and willing to unlock. But that use of force should be subject to scrutiny. The State must be prepared to show it was reasonable under all of the circumstances.

¶53 In my view, Brutsche has raised sufficient facts to survive summary judgment on these two claims. In all other respects I agree with the majority.

STEPHENS, J., concurs with CHAMBERS, J.

¶54 SANDERS, J. (dissenting) — The issue here is whether the police can destroy property belonging to an innocent third party without incurring any liability for that destruction or, alternatively, be required to pay just compensation to the property owner who is disadvantaged for the public good. The majority, by affirming summary judgment of dismissal favoring the city, shields the government from liability for trespass as well as its constitutional responsibility to pay just compensation.

¶55 The majority correctly holds police cannot destroy private property in the search for evidence unless the destruction is absolutely necessary to conduct a complete search. Majority at 673-74. But then it immediately eliminates any protection given to the property owner by affirm-

ing summary judgment for the city. Under these facts a reasonable jury could certainly find using a battering ram to destroy doors rather than using an available key was unnecessary. Moreover the majority fails to recognize where the police destroy private property for a public purpose, it is a damaging requiring just compensation under article I, section 16 of the Washington Constitution.

*Trespass*

¶56 Under long established precedent police officers are liable in trespass where they do "unnecessary damage to the property to be examined" and fail to "conduct the search as to do the least damage to the property consistent with a thorough investigation." *Goldsby v. Stewart*, 158 Wash. 39, 41, 290 P. 422 (1930). Stated another way, a warrant immunizes the police from liability for trespass *but only* where the police do no more damage to the property than is absolutely necessary for a thorough search. The only question then is whether the damage done by the police officers during the search was *necessary* to complete the search. If the damage was *not necessary* to the search, the police are liable in trespass.

¶57 Analyzing this question, we must first recall this issue was presented in a motion for summary judgment. Summary judgment is appropriate "only when reasonable minds could reach but one conclusion from" the facts, construing those facts and inferences in favor of the nonmoving party, Leo Brutsche. *Sherman v. State*, 128 Wn.2d 164, 184, 905 P.2d 355 (1995). Summary judgment must be denied if a reasonable person could find police battering down Brutsche's doors was *not necessary* for a complete search of Brutsche's property.

¶58 Construing the facts most favorably to the nonmoving party, a reasonable person could certainly determine battering down Brutsche's doors and destroying the door frames was not necessary to complete the search of his property. Brutsche offered to unlock all of the doors on

his property for the officers. He also offered the officers keys with which they could unlock all the doors themselves. The officers spurned Brutsche's offer to open the doors without damage. They chose instead to use a battering ram. Nonetheless the majority holds the officers' actions were necessary to the search *as a matter of law*. Majority at 673.

¶59 The majority asserts the officers' actions were necessary as a matter of law because of the asserted danger police officers might face when serving a warrant. Majority at 679. However even if serving warrants may sometimes be a dangerous task, that does not abrogate the officers' responsibility under *Goldsby* to serve warrants with no more damage to private property than is reasonably necessary.[14] At the least whether the asserted (but nonexistent) danger allegedly faced by the officers required destruction of the door frames rather than simply unlocking the doors is a question of fact for a jury consistent with our constitutional requirement that the right to trial by jury remain "inviolate." CONST. art. I, § 21; *LaMon v. Butler*, 112 Wn.2d 193, 199 n.5, 770 P.2d 1027 (1989).

¶60 That the suspect barricaded himself in one building to possibly destroy evidence or arm himself may allow an inference that battering down the door to that particular building was necessary to effectuate the warrant. But that is not the only inference, as even that breach was arguably not strictly necessary as Brutsche offered the police a key to open that door as well. Moreover how a suspect barricading himself in one building justifies battering down doors to other outbuildings, especially after the barricaded suspect was arrested, is left to the imagination. There was simply no evidence, beyond the speculation of the officers, the other buildings contained individuals at all, much less those seeking to harm the officers or destroy evidence. Whether baseless suspicion justifies destruction of private property is at least a question of fact for the jury.

---

[14] This is true whether Brutsche was barred from the search scene or evidence was in danger of being destroyed.

*Just compensation is required*

¶61 Not only does the majority err when it affirms summary judgment dismissing the trespass claim, it also errs by rejecting Brutsche's alternative claim for just compensation for damaging his property. Article I, section 16 of the Washington Constitution provides in part, "No private property shall be taken or damaged for public or private use without just compensation having first been made." By this provision the framers gave us a simple, clear framework to determine when the State must compensate a property owner. Was this private property? Was it taken or damaged by the State? If the answers are yes, then the property owner must be compensated.

¶62 There was no claim these doors frames were a nuisance or otherwise harmful. A plain reading of article I, section 16 mandates Brutsche be justly compensated.[15] I agree that "taking" or "damaging" does not occur in the constitutional sense where the damage is occasioned by a traditional use of the "police power"; however this was not an exercise of the police power but rather an exercise of the power of eminent domain.

¶63 The majority rejects Brutsche's takings claim based primarily on *Eggleston v. Pierce County*, 148 Wn.2d 760, 64 P.3d 618 (2003). In *Eggleston*, police seized a load bearing wall from Mrs. Eggleston's house as evidence for a murder trial involving her son. *Id.* at 763-65. *Eggleston* held collection of evidence is an exercise of the "police power," which does not require compensation, rather than eminent domain, which does. *Id.* at 775. The court asserted, "The gathering and preserving of evidence is a police power function, necessary for the safety and general welfare of

---

[15] The court would do well to heed the warnings of Justice Holmes when he wrote, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 416, 43 S. Ct. 158, 67 L. Ed. 322 (1922).

society." *Id.* at 768. For the reasons set forth in my dissent, *Eggleston* was wrongly decided, is harmful, and should now be overruled, not extended.[16]

¶64 That court failed to recognize the important distinction between the power of the police and the "police power." Appropriating or damaging property for the public good does not absolve the State from compensating the owner, precisely the opposite.[17] That is what the takings clause is all about. We strongly rejected our new majority's opinion almost 90 years ago in *Conger v. Pierce County*, 116 Wash. 27, 33, 198 P. 377 (1921) (rejecting the argument Pierce County was not liable for damages to private property because "the private individual . . . must suffer for the public good"). *Conger* held the county was not relieved from compensating the property owner "because [the county was] acting for the good of the public, or simply on the theory that the individual must suffer for the public good. To hold that [the county] would be relieved on any of these grounds would be entirely to disregard the express provisions of our constitution." *Id.* at 35. *Conger* strongly supported protecting private property rights from encroachment in the name of the public good as "[o]ne of the greatest contributions of the English-speaking people to civilization is the protection by law of the private individual in the enjoyment of his property and his personal liberties against the demands and aggressions of the public." *Id.* at 33-34.

¶65 In essence *Conger* recognized, while *Eggleston* ignored or misperceived, "[t]he talisman of a taking is government action which forces some private persons alone to shoulder affirmative public burdens, 'which, in all fairness and justice, should be borne by the public as a whole.'" *Mission Springs, Inc. v. City of Spokane*, 134 Wn.2d 947, 964, 954 P.2d 250 (1998) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554

---

[16] *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970).

[17] *See* William B. Stoebuck, *A General Theory of Eminent Domain*, 47 Wash. L. Rev. 553 (1972).

(1960)); *accord Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994). *Eggleston* erroneously required Mrs. Eggleston to bear the entire cost of this public acquisition of her private property on her lonely shoulders, whereas this burden in fairness and justice should be shared with the public as a whole. The same can be said of Mr. Brutsche, who the majority forces to uniquely shoulder the entire burden of police destruction of his property to gather evidence for the public good. This burden must be appropriately "borne by the public as a whole"[18] to satisfy the constitutional mandate.

¶66 When considering whether an exercise of the police power immunizes the State from compensating a property owner for damaging or taking his property, it is important to understand the traditional meaning of "police power." It seems elementary the police power is *not* the power of the police, but rather the power *to* police (or protect) our rights.

> The most important power surrendered to government is what Locke and others called "the executive power" and what is sometimes called the "police power." *This is the power to enforce or "police" one's rights when they have been violated by others.* Indeed, John Locke argued that it was the "inconvenience" of exercising the executive power in the state of nature that justified the creation of an "imperial magistrate"—that is, government.

RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION 70-71 (2004) (emphasis added); *see also* CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES 4-5 (1886);[19] CATO HANDBOOK FOR CONGRESS: POLICY

---

[18] *Armstrong*, 364 U.S. at 49.

[19]
[T]he police power of the government, as understood in the constitutional law of the United States, is simply the power of the government to establish provisions for the enforcement of the common as well as civil-law maxim, *sic utere tuo, ut alienum non loedas*. . . . Any law which goes beyond that principle, which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public welfare and the general security, cannot be included in the police power of the government. It is a governmental

RECOMMENDATIONS FOR THE 106TH CONGRESS 206 (Edward H. Crane & David Boaz eds., 1999) (the police power is "the power each of us has in the state of nature to secure his rights"). For example, if the police acquire land for a police station, which ultimately serves the ends of law enforcement, such is clearly an exercise of the power of eminent domain, requiring just compensation. If, however, government destroys property because that property is harmful, or used in a harmful way, that is not an acquisition (or damaging) for the public good but an abatement of a nuisance, requiring no compensation. *See, e.g., Miller v. Schoene*, 276 U.S. 272, 48 S. Ct. 246, 72 L. Ed. 568 (1928).

¶67 Even if we accept, which I do not,[20] that the police power of the State is limited only by the requirement it "reasonably tend to promote some interest of the State, and not violate any constitutional mandate,"[21] this does not answer the question of whether this action falls under the "police power" rather than eminent domain.

¶68 "Police power" historically has allowed the government to physically destroy, take, or damage private property "to avert an immediate danger" posed by the property itself.[22] It is this power which allows the state, without compensation, to raze houses in an effort to contain a fire[23] or destroy diseased cedar trees in an effort to prevent the

---

usurpation, and violates the principles of abstract justice, as they have been developed under our republican institutions.

TIEDEMAN, *supra*, at 4-5. "Use your property so as not to damage another's; so use your own as not to injure another's property." BLACK'S LAW DICTIONARY 1757 (8th ed. 1999).

[20] As has been noted, "This broad definition of the police power appears overinclusive" and has significantly expanded in scope since the adoption of the constitution. Hugh D. Spitzer, *Municipal Police Power in Washington State*, 75 WASH. L. REV. 495, 506 (2000).

[21] *CLEAN v. State*, 130 Wn.2d 782, 805, 928 P.2d 1054 (1996).

[22] John M. Groen & Richard M. Stephens, *Takings Law*, Lucas, *and the Growth Management Act*, 16 U. PUGET SOUND L. REV. 1259, 1290 (1993).

[23] *See, e.g., Bowditch v. City of Boston*, 101 U.S. (11 Otto) 16, 25 L. Ed. 980 (1880).

disease from spreading.[24] But that is not our present case. Here the doors and the jambs in and of themselves presented no danger to the community justifying their destruction.

¶69 The distinction between police power and eminent domain was specifically recognized in Washington nearly 90 years ago in *Conger*.[25] There the court defined "police power" as the power of the State to prohibit the owner of property from using his property in ways harmful to others. It held "[e]minent domain takes private property for a public use, while the police power regulates its use and enjoyment, or if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health and general welfare of the public." *Conger*, 116 Wash. at 36. Put another way the police power allows the State to "prevent all things harmful to the comfort, welfare and safety of society." *Id.* As *Conger* drew the distinction, the police power allows only the State to prohibit the property owner from using his property in ways harmful to others to avoid the just compensation constitutional mandate.

¶70 The *Conger* distinction was supported by the Latin maxim *sic utere tuo ut alienum non laedas*[26] and by several treatises published at the turn of the 20th century, roughly contemporaneous with the state constitution. Since constitutional provisions should be interpreted as they were conceived at the time of adoption, sources such as these are invaluable to understanding our constitutional protections. *State v. Brunn*, 22 Wn.2d 120, 139, 154 P.2d 826 (1945). These treatises uniformly describe the police power as the ability of the State to restrict landowners from using their

---

[24] *Miller*, 276 U.S. 272.

[25] *Conger* is important for more than its longevity. Constitutional provisions should be interpreted as they were conceived at the time of adoption. *State v. Brunn*, 22 Wn.2d 120, 139, 154 P.2d 826 (1945). *Conger*, decided only 32 years after adoption of the constitution, is a good indicator of the understanding of the terms nearer the time of the constitution's adoption.

[26] *See* BLACK's LAW DICTIONARY, *supra*, at 1757.

property to harm the public. The landowner "is . . . bound so to use and enjoy his own as not to interfere with the general welfare of the community in which he lives. It is the enforcement of this . . . duty which pertains to the police power of the State so far as the exercise of that power affects private property." 1 JOHN LEWIS, A TREATISE ON THE LAW OF EMINENT DOMAIN IN THE UNITED STATES § 6, at 14-15 (2d ed. 1900) (footnote omitted). "[I]t may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful . . . ."[27] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS § 511, at 546-47 (1904). As stated by Judge Dillon in 1890, "[t]his power to restrain a private injurious use of property, is essentially different from the right of eminent domain. It is not a taking of private property for public use, but a salutary restraint on a noxious use by the owner . . . ." JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 141, at 212 (4th ed. 1890). As these treatises demonstrate, the "police power" was generally understood to be the power to prevent the use of property to harm others. However where the individual was deprived of the use of his harmless property (or it was damaged) for the public good, the State exercised its power of eminent domain.

¶71 This distinction between the police power and the power of eminent domain, vital and vibrant as it was at the time the constitution was adopted, still remains today. Professor Stoebuck reflected this distinction in his influential work, William B. Stoebuck, *A General Theory of Eminent Domain*, 47 WASH. L. REV. 553, 569 (1972), clarifying when the State acquires property for the public good, it exercises its power of eminent domain and not its police power. Other experts continue to recognize this distinction as well, noting eminent domain is "the power to take property for public use upon payment of just compensa-

---

[27] The Washington Constitution broadens the traditional eminent domain protections to include property that is damaged, as well as taken, by the State. CONST. art. I, § 16.

tion," whereas the police power is the "power to secure rights, through restraints or sanctions, not some general power to provide public goods." CATO HANDBOOK FOR CONGRESS, *supra*, at 206. Of importance, this court again recognized this distinction in *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 15, 829 P.2d 765 (1992), where we held the police power was exceeded where the ordinance went "beyond preventing harm." Distinguishing police power (the State's ability to prevent harm to others) from eminent domain (the State's ability to take or damage property for the public good) is based on both historical and current sources and should be followed here.

¶72 Understanding this distinction allows the "police power" to be harmonized with the power of eminent domain, maintaining the integrity of each. Conceptually we must recognize "as a legal term property denotes not material things but certain rights." Morris R. Cohen, *Property and Sovereignty*, 13 CORNELL L.Q. 8, 11-12 (1927-28). However those rights simply do not include the right to use property in a manner which harms the public. *See Mugler v. Kansas*, 123 U.S. 623, 662-63, 8 S. Ct. 273, 31 L. Ed. 205 (1887) ("Nor can it be said that government interferes with or impairs any one's constitutional rights . . . of property, when it determines that the manufacture and sale of intoxicating drinks . . . are, or may become, hurtful to society, and constitute, therefore, a business in which no one may lawfully engage."); *see also Conger*, 116 Wash. at 36 (quoting 1 LEWIS, *supra*, § 6). As such, no property right is infringed when the State prohibits use of the property in a way that harms the public or creates a nuisance; therefore no property has been taken and hence no compensation is required. *See, e.g., Mugler*, 123 U.S. at 662-63. On the other hand, when government takes or damages an actual right one has in his property, compensation is mandatory. CONST. art. I, § 16 ("No property *shall* be taken or damaged . . . without just compensation having been first made." (emphasis added)).

¶73 The majority's analysis is also squarely at odds with the Texas Supreme Court's sensible outcome in *Steele v. City of Houston*, 603 S.W.2d 786 (Tex. 1980). There the owners of a house sought compensation after their house was set ablaze by police officers in an effort to capture fugitives hiding in the house. *Id.* at 789. The Texas court properly rejected the assertion that destroying the property "for the safety of the public" was a proper exercise of the police power and mandated just compensation. *Id.* at 793. However our majority would apparently abandon this sensible outcome to reach the absurd conclusion that the property owners should bear the entire loss of their home, even though they were innocent of any wrongdoing and the house was burned for the public good of law enforcement. I agree with the Texas court when it held, "[I]nnocent third parties are entitled by the Constitution[28] to compensation for their property." *Id.* Once again, an innocent property owner should not be forced " 'to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Dolan*, 512 U.S. at 384 (quoting *Armstrong*, 364 U.S. at 49).

¶74 For these reasons Brutsche's constitutional taking or damaging claim falls squarely within article I, section 16, requiring the State to justly compensate Brutsche for the property destroyed during the search.

¶75 The trial court's summary judgment should be reversed to reinstate Brutsche's trespass claim. It is at least a question of fact whether the destruction of Brutsche's property was necessary to conduct a complete search. Otherwise, damage to Brutsche's property requires just compensation pursuant to article I, section 16. This burden

---

[28] The case involved a provision of the Texas Constitution, which provides in relevant part, "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ." Tex. Const. art. I, § 17.

must in justice and fairness be borne by society as a whole because it is (allegedly) a necessary cost of law enforcement.

¶76 I dissent.

J.M. JOHNSON, J., concurs with SANDERS, J.

Reconsideration denied December 23, 2008.